Deaice, Ch. J.,
delivered the opinion of the court:
Upon the facts as found by the court three questions arise 1. Whether the collision which caused the loss of the schooner William Carlton was due to the fault of that vessel. 2. Whether it was due to the fault of both that vessel and the steamer Stonewall. 3. Whether it was due to the fault of the steamer Stonewall. If the first question should be answered affirmatively, the claimants are not entitled to recover. If the •second should be so answered, the loss must be divided between ■the two vessels. If the third should be so answered, then the loss must fall upon the owner of the Stonewall.
The decision of these questions brings into view some of the rules prescribed, for vessels in the “ Act fixing certain rules and ■regulations for preventing collisions on the waterf (13 Stat. L., 58,) which was passed April 29,1864, and went into effect September 1, 1864. The following are the rules contained in that act which bear 'upon this case :
“Article 2. The lights mentioned in the following articles, and no others, shall be carried in all weathers between sunset and sunrise.
“ Article 3. All steam-vessels when under way shall carry—
“ a. At the foremast-head a bright white light, so fixed as to show a uniform and unbroken light over an arc of the horizon of twenty points of the compass, so fixed as to throw the light of ten points on each side of the ship, viz, from right ahead to-two points abaft the beam on either side, and of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least five miles.
“ 5. On the starboard side a green light, so constructed as to throw a uniform and unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw the light from *491 right ahead to two points abaft the beam on the starboard side, and of such character as to be visible on a dark night, with a clear atmosphere, at a distance of at least two miles.
“ o. On the port side a red light, so constructed as to show a uniform unbroken light^over an arc of the horizon of ten points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the port side, and of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least two miles.
“ d. The said green and red side-lights shall be fitted with inboard screens, projecting at least three feet forward from the light, so as to prevent these lights from being seen across the bow.
“ Article 5. Sailing-ships under way, or being towed, shall carry the same lights as steamships under way, with the exception of the white mast-head lights, which they shall never carry.
11 Article 7. Ships, whether steamships or sailing-ships, when at anchor in roadsteads or fairways, shall, between sunset and sunrise, exhibit, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light in a globular lantern of eight inches in diameter, and so constructed as to show a clear, uniform, and unbroken light, visible all around the horizon, and at a distance of at least one mile.
“ Article 15. If two ships, one of which is a sailing-ship and the other a steamship, are proceeding in such direction as to involve risk of collision, the steamship shall keep out of the way of the sailing-ship.
“Article 16. Every steamship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse. # * *
“ Article 18. When, by the above rules, one of two ships is to keep out of the way, the other shall keep her course, subject to the qualifications contained in the following articles:
“ Article 19. In obeying and construing these rules, due regard must be had to all the dangers of navigation; and due regard must also be had to any special circumstances which may exist in any particular case rendering a departure from the above rules necessary in order to avoid immediate danger.”
In every case of collision almost the first question to be determined is whether either vessel was in fault in the matter of having lookouts properly stationed. In this respect there does *492 not appear to have been fault on the part of either of these vessels.
The next question is as to lights. In this matter we consider it clear that the Carlton complied with the above rules. Her lights were seen on the Ehode Island, the foremost of the three ships, thirty minutes, and by the Hornet, the hindmost of the ships, twenty minutes before the collision took place; which proves that they were visible at a distance of miles.
We consider it equally clear that in the matter of side-lights the Stonewall was in fault. The lights were there, and each was on its proper side of the vessel, but they were not so fixed as to throw an unbroken light right ahead, as required by the rule. Placed on the after turret, “ considerably inboard,” the light was broken to a vessel ahead by the main and fore rigging and the running-gear, and also by the catheads, which were higher than the lights. This was a clear violation of the rule, and the result of it was the inability of the officers of the Carlton to see the Stonewall’s side-lights when the vessels were near each other, though they made careful scrutiny to see if she showed such lights.
But it was in the management of the Stonewall that her greater fault was committed. Though her officer of the deck saw one of the lights of the Carlton ahead when she was half a mile off, he made no effort to slacken the speed of his vessel until the vessels were too near to each other to avoid a collision. The engines of the Stonewall should at least have slowed, if not stopped and reversed, immediately upon the discovery of the Carlton’s light ahead. From the moment of that discovery the duty of the Stonewall was to “keep out of the way” of the Carlton j and we cannot doubt that it was in her power to have done so. Had she put her helm aport when the light of the Carlton was first seen, or had she then stopped her engines,, the collision could hardly have occurred. But she was kept at undiminished speed, and on her previous course, until collision was imminent, and then her deck-officer seemed to lose his presence of mind, and ordered the helm astarboard when it should have been aport; and the collision ensued.
It may, however, be supposed that there was fault on the part of the officers of the Carlton in not keeping her steady on her course, as required by article 18 of the above rules; but we do not consider this position tenable. It will be observed that *493 the requirement upon the sailing-vessel under such circumstances to keep her course is subject to the qualification that, in obeying thatrule, “ dueregard must be had to all dangers of navigation, and * * * to any special circumstances which may exist in any particular case rendering a departure from the above rules necessary in order to avoid immediate danger.” With reference to this qualification, what was the situation of the Carlton? She fouud herself approaching the Rhode Island, and, to avoid her, she changed her course only half a point, and immediately on passing her, and before the collision, resumed her previous course. We cannot regard this as a fault on her part, but a proper regard “to special circumstances, rendering a departure from the above rules necessary in order to avoid immediate danger.” But, in the language of the Supreme Court in The Carroll, (8 Wall., 302,) “if there was fault on the part of the schooner, the steamer committed a far greater fault in suffering the vessels to get in such dangerous proximity at the moment preceding the collision; and as she has furnished no excuse for this misconduct, she is chargeable with all the damages resulting from this collision.”
Those damages are, first, the value of the Carlton, $25,200; second, the freight stipulated to be paid for the transportation of the cargo of 219i§ tons of coal, at $4.75 per ton, amounting to $1,385.30; and, thirdly, the value of the cargo at the place of shipment, $7 per ton, aggregating $2,041.55.
Judgment will be entered in favor of the owners of the Carlton for the first two of those items, aggregating $26,585.30, and in favor of the Boston and Sandwich Glass Company for the third item.